J-S56020-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: D.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: C.J., MOTHER | : | |
| | : | |
| | : | No. 670 MDA 2018 |

Appeal from the Order Entered, March 20, 2018,
in the Court of Common Pleas of Franklin County,
Orphans' Court at No(s):  9-ADOPT-2018.

| | | |
|---|---|---|
| IN THE INTEREST OF: D.J., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: C.J., MOTHER | : | |
| | : | |
| | : | No. 671 MDA 2018 |

Appeal from the Order Entered, March 20, 2018,
in the Court of Common Pleas of Franklin County,
Juvenile Division at No(s):  CP-28-DP-0000025-2016.

BEFORE:  GANTMAN, P.J., KUNSELMAN, J., and MUSMANNO, J.

MEMORANDUM BY KUNSELMAN, J.:          **FILED DECEMBER 03, 2018**

C.J. (Mother) appeals from the order that involuntarily terminated her rights to her 5-year-old son, D.J. (Child), pursuant to 23 Pa.C.S.A. § 2511(a)(2); (a)(5); (a)(8); and (b).[1, 2]

As evidenced by the dual caption, Mother initially raised matters relating to both the termination of her parental rights and the order changing the goal of the dependency case from reunification to adoption. Mother has since abandoned the goal change portion of her contest; in her appellate brief, she sets forth two questions involved, both of which reference only the termination. First, she alleges there was insufficient evidence to support the grounds for termination under § 2511(a). Second, she alleges that even if there were grounds, termination would not be in Child's best interests under § 2511(b).

We are mindful of our well-settled standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because

---

[1] The court also terminated the rights of D.S. (Father) who did not appear for the termination hearing and does not appeal now.

[2] Because there was no conflict, Child's best interests and his legal interests were simultaneously represented by Attorney Kristen Hamilton. *See* N.T., 3/20/18, at 96-97.

the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.,* 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101–2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re Adoption of C.D.R.,* 111 A.3d 1212, 1215 (Pa. Super. 2015) (citations omitted).

In this case, the orphans' court terminated Mother's parental rights pursuant to Section 2511(a)(2), (5), (8), and (b). We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.,* 843 A.2d 380, 384 (Pa.Super.2004) (*en banc*), *appeal denied,* 863 A.2d 1141 (Pa. 2004).

The learned Judge Angela R. Krom authored an extensive, well-reasoned Rule 1925(a) opinion supporting the orphans' court decision. Upon our review

- 3 -

of the record, we discern no abuse of discretion. Because it thoroughly addresses the matters raised on appeal, we adopt, as our own, the orphans' court opinion insofar as it pertains to the termination issue.[3]  We direct the parties to attach a copy of the orphans' court opinion to this memorandum in the event of further proceedings.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/03/2018

---

[3] We redact the parties' names from the orphans' court opinion, but otherwise keep intact the entirety of the document; we do not adopt that section of the opinion addressing Mother's abandoned goal change issue.

# IN THE COURT OF COMMON PLEAS OF THE 39TH JUDICIAL DISTRICT OF PENNSYLVANIA – FRANKLIN COUNTY BRANCH

| | | |
|---|---|---|
| In re: Adoption of | : | Orphans' Court Division |
| D.J., a minor | : | |
| Date of Birth: 5/31/2012 | : | No. 9-ADOPT-2018 |

| | | |
|---|---|---|
| In the Interest of | : | Juvenile Court Division |
| D.J., a minor | : | |
| Date of Birth: 5/31/2012 | : | CP-28-DP-0000025-2016 |

## OPINION sur Pa.R.A.P. 1925(a)

Before the Court is C████ J███'s Notice of Appeal from the Decree entered March 20, 2018, terminating her parental rights to D.J., her minor son. Also before the Court is C████ J███'s Notice of Appeal from this Court's Order of March 20, 2018, changing D.J.'s permanency goal from reunification to adoption. As no error occurred, this Court's prior determinations should be affirmed.

## STATEMENT OF CASE

D.J. was born on May 31, 2012. C████ J███ ("Mother") is the natural mother of D.J. D███ S████ ("Father") is the natural father of D.J.

On February 23, 2018, Franklin County Children and Youth Services ("the Agency") filed a Petition for the Involuntary Termination of Parental Rights ("Petition") seeking to terminate the parental rights of Mother and Father. Concurrently, in the ongoing dependency action, the Agency requested this Court

change the permanency goal from reunification to adoption. On March 20, 2018, this Court held a hearing ("TPR hearing") on the Agency's Petition. Father, represented by Attorney Michael J. Connor, failed to appear at the TPR hearing. Mother, represented by Attorney Abigail Salawage, appeared at the TPR hearing. Attorney Kristen Hamilton, D.J.'s legal counsel and Guardian Ad Litem ("GAL"), also participated in the TPR hearing.

This Court issued Decrees dated March 20, 2018, terminating both Mother's and Father's parental rights. Thereafter, based on the evidence presented at the TPR hearing, this Court changed D.J.'s permanency goal from reunification to adoption. Mother filed a Notice of Appeal of a Children's Fast Track Appeal pursuant to Pa.R.A.P. 102, along with a Concise Statement of Matters Complained on Appeal on April 19, 2018. This Court now responds to Mother's claims of error in both the Juvenile Court and Orphans' Court matters.

## FACTUAL FINDINGS

The Court will review the evidence presented at the TPR hearing before addressing Mother's arguments.

The Agency presented Elizabeth Johnston ("Ms. Johnston"). Ms. Johnston is the Agency's caseworker assigned to D.J.'s case. Transcript of Proceedings of Termination of Parental Rights Hearing, March 20, 2018, ("T.P. 3/20/18") at 6-7. Ms. Johnston testified the Agency initially received a referral regarding D.J.'s

2

family on September 20, 2015, which reported the following issues: chronic homelessness[1], substance abuse[2], extreme anger[3], and lack of supervision. Id. at 8. The Agency attempted to locate the family, but was unsuccessful. Id. In February of 2016, the Agency received a second referral, which reported that D.J.'s older sister was missing from school and the family was living at the New Hope Shelter in Waynesboro, PA. Id. By the end of March of 2016, the Agency successfully located the family at the Super 8 Motel in Chambersburg, PA. Id. at 9.

On March 31, 2016, the Agency conducted an unannounced visit to the hotel. Id. Upon arrival, Mother stated she was moving her family to another hotel; Mother expressed difficulties applying for food stamps and other support accommodations. Id. At this point, the Agency provided Mother with housing resources. Id. On April 1, 2016, the Agency conducted a second unannounced visit to the hotel and discovered Mr. L███ asleep and alone with D.J. and his two sisters. Id. Mr. L███ had difficulty waking up, appeared to be intoxicated, and refused a drug test. Id. The Agency also observed bruising on D.J.'s back. As a result, D.J. was placed in the temporary legal and physical custody of the Agency on April 1, 2016. Id. at 9; see also Exhibit 1.

---

[1] The Agency believed the family was living in their van at this time.
[2] The Agency believed Mother and her husband M███ L███ ("Mr. L███") were abusing morphine. Mother later testified she used prescription morphine for back pain, but stopped taking it "once it seemed to be a problem for the courts." Id. at 68-69.
[3] The Agency believed Mr. L███ exhibited extreme anger toward the family.

After D.J. was placed in the custody of the Agency, Mother and Father proposed names of family members as potential resources. Id. at 10-11. The Agency mailed kinship letters and received responses from M███ S███, R██ L███, and E███ H███.[4] Id. at 11. Upon investigation, the Agency determined M███ S███, R██ L███, and E███ H███ were not appropriate resources because they lacked sufficient living space for D.J. Id. at 11-12. During this time period, D.J. displayed aggressive behavior in his initial foster home; D.J. frequently bit, pushed, and hit other children, including his older sister M.J. Id. D.J. also displayed traumatic behavior; he talked and screamed in his sleep, called himself a bad boy, and hit himself as punishment for taking blankets and food from his sisters. Id. For these reasons, the Agency referred D.J. to Pathways for counseling. Id.

On May 13, 2016, D.J. was adjudicated dependent and his permanency goal was set for reunification. Id. at 10; see also Exhibits 3-4. Mother and Father were present for this dependency hearing. Id. As a result of D.J.'s adjudication and dependency, Mother was ordered to participate in a drug and alcohol assessment and follow the recommendations, submit to random drug screens, participate in a parental fitness assessment and follow the recommendations, obtain and maintain financial stability, maintain stable housing, and maintain consistent visitation with

---

[4] M███ S███ is D.J.'s paternal grandmother. R███ L███ is Mr. L███'s father. E███ H███ is Mother's stepfather.

D.J. Id. at 13. Father was ordered to participate in a parental fitness assessment, obtain and maintain financial stability, maintain stable housing, and maintain consistent visitation with D.J. Id. at 13-14.

Ms. Johnston also testified regarding the services ordered for Mother. Id. at 14. Ms. Johnston confirmed Mother participated in the parental fitness assessment on June 17, 2016. Id. at 14; see also Petitioner's Exhibit 15. As a result of the parental fitness assessment, Mother was deemed incapable of parenting without any treatment or services. Id. at 14. Mother was recommended to complete outpatient therapy once per week for twenty-six weeks, maintain use of psychotropic medications, participate in a pain management evaluation, participate in a drug and alcohol evaluation, and complete parent training. Id. However, Mother failed to accurately report Mr. L████'s physical violence to the evaluator at this time.[5] Id. at 40-41.

Ms. Johnston confirmed Mother attended outpatient therapy from October of 2016 to May 18, 2017. Id. at 14-15. After May 18, 2017, Mother stopped attending therapy due a conflict with her work schedule. In October of 2017, the Agency reminded Mother to complete her therapy. Id. at 15. However, Mother incorrectly reported she completed her therapy and believed she did not need any counseling.

_____

[5] Despite Mother's assertions at the time, the Agency believed physical violence was occurring in the household based on D.J.'s expressions and comments. Mother later testified she separated from Mr. L████ due to his emotional and physical abuse. Specifically, Mr. L████ abused her by choking her. Id. at 65-66, 80.

5

Id. To date, Mother has not been successfully discharged from her therapy requirements.[6] Id. Ms. Johnston also confirmed Mother completed the drug and alcohol assessment at Pyramid Healthcare. Id. at 15-16. Mother was not required to complete any additional services as a result of the drug and alcohol assessment. Id. However, Ms. Johnston testified Mother did not maintain continuous use of her psychotropic medications. Id.

Ms. Johnston testified regarding Mother's requirement to submit to random drug screens. Id. at 16. On June 29, 2017, Mother tested positive for Tetrahydrocannabinol ("THC") and alcohol.[7] Id. at 16, 35. On October 2, 2017, Mother refused to allow Ms. Johnston to drug test her despite being aware that a refusal is automatically deemed a positive result.[8] Id.

Ms. Johnston testified regarding Mother's inability to obtain and maintain financial stability. Id. at 16-17. Ms. Johnston explained Mother has changed jobs several times throughout the period that D.J. has been in placement. Id. at 16. Recently, Mother applied to jobs in Maryland, but did not provide the Agency with any evidence of employment and financial stability. Id.

---

[6] Mother later acknowledged she was discharged from PA Counseling due to lack of attendance. Mother explained she had several conflicts with work and stopped attending counseling around the middle of 2017. Id. at 62.
[7] Mother later testified she smoked marijuana for celebratory purposes when she leased her house on May 10, 2017. Id. at 63.
[8] According to Mother, she requested to take the drug test at a later time. Id. at 63, 77-78.

Ms. Johnston testified regarding Mother's inability to maintain consistent visitation with D.J. Id. at 17. The Agency approved Mother for two visits per week between April 7, 2016 and December 5, 2017. Id. A majority of the visits were offered at the ABC House, except for a brief period between February 3, 2017 and April 10, 2017. Id. at 17-18. During this period, the visits were only offered at the Agency because there were concerns for the safety of the children and parent educators at ABC. Id. In total, Mother attended only thirty-nine of the fifty-one offered two-hour visits. Id. at 17. Mother's last visit with D.J. at the ABC House occurred on November 16, 2017. Id. at 18.

On December 5, 2017, Mother was discharged from the ABC House due to lack of attendance. Id. at 18. According to Mother, she had difficulties with transportation because she lived in Maryland and did not have a working car. Id. at 18-19. Between December 5, 2017 and March 5, 2018, Mother failed to contact the Agency. Id. at 18-19, 36-37. On March 5, 2018, Mother called the Agency and requested visitation with D.J. Id. at 19. The Agency scheduled a one-hour visitation with D.J. on March 16, 2018. Id. Ms. Johnston testified the visit went well, however Mother was a half-hour late; Mother took pictures and played with her children, including D.J.[9] Id.

_____

[9] Ms. Johnston later testified D.J. was comfortable interacting with Mother, but does not ask to see Mother when he is not with her. Id. at 31-32. However, Mother later testified that D.J. asked her when he can come home. Id. at 65, 73, 89.

Ms. Johnston testified regarding Mother's limited participation in filial therapy. Id. 19-20. Mother was offered to participate in filial therapy in order to build a stronger bond with D.J.[10] Id. Mother only attended one session despite the fact that D.J. has been in therapy for over a year. Id. at 20. Mother also had limited contact with D.J.'s therapist. Id. at 20, 47-48. Currently, D.J.'s foster mother attends therapy with D.J. Id. at 20.

Ms. Johnston further testified regarding Mother's inability to secure stable housing. Id. Between April 4, 2016 and July of 2016, Mother lived with various friends. Id. Between August 11, 2016 and October 24, 2016, Mother lived in a homeless shelter. Id. Between October 24, 2016 and December 5, 2016, Mother lived with friends in Waynesboro, Franklin County, Pennsylvania. Id. Between December 5, 2016 and October 2, 2017, Mother lived with Mr. L███ in two different leased houses. Id. at 21. On October 2, 2017, Mother and Mr. L███ were evicted due to failure to pay rent; Mother then separated from Mr. L███ and moved to Maryland. Id. On March 5, 2018, Mother reported she is now living between her mother's house and a boyfriend's house. Id. As of the date of the hearing, the Agency did not know where Mother was living. Id.

---

[10] Ms. Johnston later testified D.J. is diagnosed with attention deficit hyperactivity disorder ("ADHD"), oppositional defiant disorder ("ODD"), borderline intellectual functioning, and adjustment disorder with mixed problems of mood and conduct behavior. Recently, D.J. has displayed symptoms of reactive attachment disorder ("RAD"). Id. at 45, 47-48. Mother later testified she only was aware of D.J.'s ODD and AHDH diagnoses. Id. at 90.

Ms. Johnston last testified regarding D.J.'s foster home. Id. at 27-28, 45. D.J. has been living in his current foster home for over a year.[11] Id. at 28. Ms. Johnston explained D.J. has a parent-child relationship with his foster family; D.J. is affectionate towards his foster parents and enjoys living with them. Id. Although D.J. calls them by their first name, he reported to Ms. Johnston that he now shares the last name of his foster family.[12] Id. at 28-29. Ms. Johnston also explained that D.J.'s foster family makes arrangements with his half-sister's foster family every other week so the children can see each other. Id. at 29.

Mother next presented herself. Id. at 55. Mother testified regarding her requirements to obtain and maintain financial stability and secure stable housing. Id. Mother testified she does not have a permanent residence, but receives her mail at her father's house in Sabillasville, Maryland. Id. at 55-56. Mother testified she separated from Mr. L█████ in September of 2017 and is "working on starting over." Id. at 56-57. At this time, Mother is searching for full-time employment to save up for a car and residence.[13] Id. Mother testified she was recently hired at a

---

[11] D.J. lived in three other foster homes prior to his current one. D.J. moved between the three foster homes due to challenging and sexualized behavior. The Agency believes trauma therapy and the placement with his current new foster helped correct this behavior.

[12] Ms. Johnston later testified the foster family has a daughter in college who D.J. refers to as his sister. D.J. also refers to another child in the foster family as brother. Id. at 47.

[13] Mother later explained she and her boyfriend J.B. are looking for a place to live together. Id. at 58-59.

temporary agency, but is waiting for a start date.[14] Id. at 57. Mother also helps her father with landscaping, snow removal, and mowing jobs. Id. at 57-58. If provided more time, Mother believed she could obtain housing within a month and a half. Id. at 72.

Mother testified regarding her requirement to maintain use of psychotropic medications. Id. at 59. Mother currently takes 20 milligrams of Lexapro once in the morning, one milligram of Xanax three times per day, and Trazodone at night. Id. Mother testified she has taken her medications since she started her therapy at PA Counseling. Id. Mother was initially prescribed her medications by a psychiatrist at PA Counseling, but currently is prescribed her medications by a doctor at Mission of Mercy in Gettysburg, Pennsylvania.[15] Id. at 59-60. Mother has no health insurance at this time. Id. at 61.

Mother further testified regarding her requirement to maintain consistent visitation with D.J. Id. at 63-64. Mother explained she visited D.J. twice a week for two hours. Id. at 64. She stopped visiting D.J. due to a lack of transportation.[16] Id. at 64-65. Mother also addressed the Agency's concerns regarding the lack of

---

[14] Mother explained she has reliable transportation from her stepfather to get to this job when she starts.

[15] Mother testified she meets with a doctor once per month and is consistently taking her medications.

[16] Mother testified she did not see or have any contact with D.J. from November of 2017 to March of 2018. Mother explained she lives over an hour from Chambersburg and it has been difficult to visit D.J. without a car. Id. at 56-57, 75.

communication. Id. at 70. Mother testified she did not have access to a phone for a month and a half, but attempted to contact the Agency eight or nine times since November of 2017. Id. Mother testified the Agency only returned her last two phone calls. Id. at 70, 87-89.

## ISSUES RAISED

In the above-captioned Orphans' Court action, Mother alleges this Court's decision to terminate her parental rights was not supported by clear and convincing evidence, and therefore constituted an abuse of discretion for the following reasons: there was insufficient evidence to determine that (1) Mother failed to perform parental duties for a period of at least six months immediately preceding the filing of the Petition; (2) Mother caused the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being; (3) the conditions which led to placement of the child cannot or will not be remedied by Mother within a reasonable time; and (4) termination of Mother's parental rights is not in the child's best interests.

In the above-captioned Juvenile Court action, Mother alleges this Court's decision to change the permanency goal from reunification to adoption was not supported by clear and convincing evidence, and was therefore an abuse of discretion for the following reasons: (1) there was insufficient evidence to determine that the child's best interests are met by a change of goal to adoption;

11

and (2) Mother could remedy the barriers to reunification if provided additional time and services.

## DISCUSSION

### I. Termination of Parental Rights

The standard of review in a termination of parental rights case is well established:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

In re S.H., 879 A.2d 802, 805 (Pa. Super. 2005) (citation omitted).

The petitioner has the burden to prove by clear and convincing evidence that the asserted grounds for seeking termination are valid in a termination of parental rights case. In re A.S., 11 A.3d 473, 477 (Pa. Super. 2010) (citation omitted). Our appellate courts have stated the following:

> The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue. The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. If

competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result.

Id. (citations omitted).

Additionally, parental rights are not absolute: "[a] parent's basic constitutional right to the custody and rearing of ... [his] children is converted, upon the failure to fulfill ... parental duties, to the children's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." In re A.S., 11 A.3d at 478 (citation omitted). Parental rights may be involuntarily terminated where any one subsection of 23 Pa.C.S.A. § 2511(a) is satisfied, along with consideration of 23 Pa.C.S.A. § 2511(b) provisions. In re Z.P., 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation omitted). "The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state may properly be considered unfit and have his parental rights terminated." Id. at 1118 (citation omitted).

In the instant case, this Court found grounds for termination existed under Sections 2511(a)(2), (5), and (8). After engaging in the first part of the test, under Section 2511(a), this Court also found termination would serve the best interests of D.J. pursuant to Section 2511(b). On appeal, Mother argues this Court's decision was not supported by clear and convincing evidence, therefore constituting an

13

abuse of discretion. We disagree, and will address each ground for termination in turn.

## A. Termination of Parental Rights Under Section 2511(a)(2)

In order to terminate parental rights pursuant to Section 2511(a)(2), the following three elements must be established:

> (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

In re D.L.B., 166 A.3d 322, 327 (Pa. Super. 2017) (citation omitted); see also 23 Pa.C.S.A. § 2511(a)(2). Additionally, statutory grounds for termination of parental rights due to parental incapacity that cannot be remedied are not limited to affirmative misconduct; "[t]o the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." Id. (citation omitted).

Here, the Agency established by clear and convincing evidence that Mother's parental rights should be terminated pursuant to Section 2511(a)(2). Although Mother participated in some of the ordered services, Mother failed to complete all of the services. Mother completed the parental fitness assessment and followed through with some of the recommendations, but failed to follow through with and successfully complete outpatient therapy. Citing both work conflicts and her belief that she did not need therapy, Mother failed to attend session and was

14

unsuccessfully discharged. Mother also falsely suggested to the Agency that she had completed her therapy requirements. To date, Mother has not successfully completed her therapy requirements.

Mother completed the drug and alcohol assessment and was not recommended to participate in any further treatment. However, she later failed a drug test and refused another, knowing her refusal would be considered a positive test by the Agency.

With respect to financial and housing stability, Mother failed to make the necessary steps to secure permanent employment. This Court was provided with no plan for a safe home for D.J.

Mother also failed to maintain consistent visitation and was discharged due to lack of attendance on December 5, 2017. Mother then failed to contact the Agency until March 5, 2018, despite not having seen D.J. for several months. By failing to seriously address this Court's ordered services, Mother has failed to provide essential parental care necessary for D.J.'s physical and mental well-being.

Furthermore our appellate courts have stated:

Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and *strong, continuous parental ties,* which the policy of restraint in state intervention is intended to protect. This is particularly so where

15

disruption of the family has already occurred and there is no reasonable prospect for reuniting it.

In re A.S., 11 A.3d at 478 (citing In re E.A.P., 944 A.2d 79, 82 (Pa. Super. 2008)). In light of this standard, we heavily considered D.J.'s present and future need for a stable home when we terminated Mother's parental rights. A parent must provide their child with safe and stable housing. While we recognize Mother was a victim of Mr. L█████'s repeated physical and emotional abuse, Mother nonetheless failed to protect D.J. from Mr. L█████'s abuse. Mother didn't timely disclose the abuse, placing her child at risk and resulting in a delay of necessary services for D.J. Although Mother separated from Mr. L█████ in September of 2017, Mother has made little progress in securing a safe and stable home for D.J.

Stated differently, Mother's lack of significant progress over the past twenty-two months convinces the Court she has no interest or no ability to remedy the conditions which have kept her son out of care and custody. D.J.'s right to a permanent and safe environment should not be on hold indefinitely. The law demands that a parent overcome obstacles in their path to meet their child's needs. Mother has not done so. Thus, this Court did not err in terminating Mother's parental rights pursuant to Section 2511(a)(2).

**B.      Termination of Parental Rights Under Sections 2511(a)(5), (8)**

Pursuant to Sections 2511(a)(5), (8), parental rights may be terminated when:

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

....

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. §§ 2511(a)(5), (8); see also In re S.H., 879 A.2d 802, 807 (Pa. Super.

2005) (noting the analysis under subsection (8) merely requires that the conditions

leading to placement continue to exist, whereas under subsection (5) the Court

must consider a parent's willingness or ability to remedy such conditions).

Here, the Agency established by clear and convincing evidence that

Mother's parental rights should be terminated pursuant to Sections 2511(a)(5), (8).

As noted above, Mother's inability to meet D.J.'s basic need for a safe and secure

home led to D.J.'s continued placement with the Agency for the past twenty-two

months. Despite Mother's participation in some of this Court's directives, the

conditions which led to D.J.'s placement continue to exist and Mother is unwilling

or unable to remedy the conditions. To date, Mother has not successfully

maintained visitation with D.J. or completed her therapy. Mother also has not secured full-time employment or a permanent residence.[17]

Additionally, this Court strongly believes Mother will not be able to remedy the conditions which led to D.J.'s placement. Twenty-two months was substantial time to address the situation. Furthermore, Section 2511(a)(5) requires the termination of parental rights be in the child's best interests. As discussed below, the termination of Mother's parental rights is in the best interests of D.J.

Thus, this Court did not err in terminating Mother's parental rights pursuant to Sections 2511(a)(5), (8).

## C. Termination of Parental Rights Under Section 2511(b)

If the Court finds the grounds for termination are satisfied pursuant to Section 2511(a), it must proceed to an evaluation of the child's best interests under Section 2511(b). Section 2511(b) provides the following:

> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

---

[17] Mother did not present this Court with a plan or solution to address the financial and housing concerns at the TPR hearing.

18

23 Pa.C.S.A. § 2511(b). In considering the needs and welfare of a child, the court must examine whether terminating the natural parent's rights would destroy something in existence that is necessary and beneficial. In re C.S., 761 A.2d 1197, 1202 (Pa. Super. 2000).

The evidence presented at the TPR hearing convinces this Court that termination of Mother's parental rights is in D.J.'s best interests. As discussed above, Mother failed to obtain and maintain financial and housing stability. Conversely, D.J.'s foster parents have provided D.J. with a safe and stable home. Mother also failed to maintain visitation and participate in filial therapy with D.J. Contrarily, D.J.'s foster mother actively participates in filial therapy in order to develop a critically important bond with D.J. We are convinced D.J. has the necessary support from his foster parents to assist him through any detriment as a result of our termination of Mother's parental rights.

Furthermore, terminating Mother's parental rights would not destroy "something in existence that is necessary and beneficial." In re C.S., 761 A.2d at 1202. It is possible that Mother and D.J. have a bond. However, this bond is not healthy for D.J. Mother's lack of engagement demonstrates she does not acknowledge or understand what her son needs for healthy growth and development. As a result of D.J.'s placement and therapy, he is now mentally and medically on track. This Court is convinced that the love, comfort, security, and

stability D.J. has with his foster parents outweigh any existing emotional bond D.J. has developed with Mother.

Thus, this Court did not err in terminating Mother's parental rights pursuant to Section 2511(b).

## II. Goal Change from Reunification to Adoption

The standard of review for a juvenile court's permanency determination is as follows:

> In cases involving a court's order changing the [court-ordered] goal ... to adoption, our standard of review is abuse of discretion. To hold that the trial court abused its discretion, we must determine its judgment was manifestly unreasonable, that the court disregarded the law, or that its action was a result of partiality, prejudice, bias or ill will. While this Court is bound by the facts determined in the trial court, we are not tied to the court's inferences, deductions and conclusions; we have a responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Therefore, our scope of review is broad.

In Interest of L.T., 158 A.3d 1266, 1276 (Pa. Super. 2017) (citations omitted). In a change of goal proceeding, the interests of the child supersede the interests of the parent. In re D.P., 972 A.2d 1221, 1227 (Pa. Super. 2009) (citations omitted). The burden is on the Agency to prove the change in goal would be in the best interests of the child. Id. (citation omitted). A juvenile must consider the following factors regarding permanency planning:

> Pursuant to § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to

20

consider, *inter alia*: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months.

In Interest of L.T., 158 A.3d at 1276-1277 (citations omitted). Last, a juvenile court must consider whether reasonable efforts were made to finalize the permanency plan in effect. Id. at 1277; see also 42 Pa.C.S.A. § 6351(f)(5.1).[18]

Here, our changing of D.J.'s permanency goal from reunification to adoption was held simultaneously with the termination of Mother's parental rights.[19] The evidence presented at the TPR hearing establishes that our changing of D.J.'s permanency goal from reunification to adoption is in D.J.'s best interests. Although Mother complied with some of the directives of this Court, her compliance was not sufficient or complete to overcome the Agency's request for termination and change of permanency goal from reunification to adoption.

For the past twenty-two months, Mother failed to remedy the circumstances which mandated D.J.'s continued placement. Mother also failed to provide this Court with a plan to remedy the financial and housing concerns. It is clear to this Court that Mother will not remedy the conditions which led to D.J. continued

---

[18] This Court found the Agency made reasonable efforts to finalize the permanency plan in effect.

[19] Accordingly, this Court considered the same evidence for both matters.

21

placement even if provided more time because she has made no strides to complete her therapy, maintain consistent visitation, obtain employment, and secure safe housing. D.J. deserves permanency and his life should not be put on hold "in the hope that [Mother] will summon the ability to handle the responsibilities of parenting." In re N.C., 909 A.2d 818, 824 (Pa. Super. 2006) (citation omitted). Currently, these needs are being meet by D.J.'s foster parents.

Thus, this Court did not err by changing D.J.'s permanency goal from reunification to adoption because the change is necessary to achieve permanency.

## CONCLUSION

In summary, grounds for termination of Mother's parental rights were established by clear and convincing evidence under 23 Pa.C.S.A. §§ 2511(a)(2),(5), and (8). It is in D.J.'s best interests to terminate Mother's parental rights pursuant to 42 Pa.C.S.A. § 2511(b). Furthermore, the evidence presented at the TPR hearing supported our changing of D.J.'s permanency goal from reunification to adoption. Accordingly, this Court respectfully requests the Superior Court affirm the termination of Mother's parental rights and our changing of D.J.'s permanency goal from reunification to adoption, and dismiss the instant appeals.

22